**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| BRIGHTON TRUSTEES, LLC, AS TRUSTEE, *et al.*, Plaintiffs, v. GENWORTH LIFE AND ANNUITY INSURANCE COMPANY, Defendant. | Civil No. 3:20cv240 (DJN) |

## CONSOLIDATED COMPLAINT

Plaintiffs Brighton Trustees, LLC, on behalf of and as trustee for Diamond LS Trust; Bank of Utah, solely as securities intermediary for Diamond LS Trust; and Ronald L. Daubenmier (together, "Plaintiffs"), individually and on behalf of all others similarly situated, for their Consolidated Complaint against defendant Genworth Life and Annuity Insurance Company ("GLAIC"), state as follows:

## NATURE OF THE ACTION

1.      This is a class action brought on behalf of Plaintiffs and similarly situated owners of GLAIC life insurance policies.  Plaintiffs seek to represent a class of GLAIC policyholders who have been or will soon be subjected to a massive, unlawful and excessive cost of insurance ("COI") increase by GLAIC in violation of their insurance policies.

2.      The policies at issue in this case are GE Gold, First Choice Gold, GE Gold II, First Choice Gold II and all other universal life insurance policies (or "UL policies") issued, insured or assumed by GLAIC that were or will be subjected to an increase in COI rates that was announced privately to brokers in or around September 2019 (the "Subject Policies").

3.      The principal benefit of universal life policies generally, and the Subject Policies specifically, is that, unlike other kinds of whole life insurance that require fixed monthly premium payments, the premiums required for universal life policies are flexible and need only be sufficient to cover the COI charges and certain other specified expenses. The COI charge is typically the highest charge that a policyholder pays, and the GLAIC policies explain how the COI charge is calculated using "monthly risk" rates (these rates are often referred to as "COI rates," and the terms "COI rates" and "Monthly Risk Rates" are used interchangeably herein). Because the COI charges are the main driver of how much money needs to be paid into these policies, the provision in the policy explaining how and when the Monthly Risk Rates can be adjusted is one of the most important terms of the contract. Here, the policies state that there are three main contractual requirements for adjusting Monthly Risk Rates:

> The Company will base any change on its expectations as to future investment earnings, mortality, persistency, expenses and taxes. The Company will not make any change in order to recoup prior losses. Any change in the monthly risk rates will apply to all insureds with the same combination of the following: attained age; number of years of insurance in force; net amount of risk; and premium class.

4.      In September 2019, after Plaintiffs' policies had been in force for decades, GLAIC, together with Genworth Life Insurance Company ("GLIC," and together with GLAIC and Genworth Financial, Inc., "Genworth") announced a gigantic COI rate hike effective December 1, 2019.  Genworth told policyholders that following the increase, Monthly Risk Rates would be between 40 percent and 140 percent higher than the pre-existing Monthly Risk Rate scale. This resulted in a massive increase in premiums required to maintain these policies in force.

5.      In a Bulletin sent for "producer/agent use only," which Genworth asked "NOT TO BE REPRODUCED OR SHOWN TO THE PUBLIC," Genworth stated that "almost all policyholders will experience an increase in cost of insurance charges as a result of this adjustment

in at least one upcoming policy year." In that bulletin, Genworth gave the following cryptic explanation for the increase:[1]

**The Basis for the Adjustment**

Genworth's change in the monthly risk rate, and resulting change in cost of insurance charges, is based on its expectations as to future investment earnings, mortality, persistency, expenses, and taxes, as set forth in the Policy. In accordance with the Policy, this adjustment is being made for all policies on the same policy form with the same combination of the following characteristics: Attained Age, sex, length of time insurance has been in force, net amount at risk, and premium class.

6.      Genworth further explained that it would not inform policyholders about the increase until "90 days in advance of the anniversary on which the adjustment will take effect." Genworth further explained that it "cannot provide policyholders with an illustration using the current cost of insurance rates," even though the policies promise that Genworth will provide those illustrations to policyholders upon request.

7.      Other than this explanation, Genworth did not provide any explanation for the increase. The policies were issued a long time ago, many almost twenty years ago. As a consequence, a significant portion of the policyholders are now elderly; many of them are 75 years old or older.  These policyholders bought and maintained the policies so that they and their families would be protected by life insurance coverage as they entered their senior years. To that end, the policyholders were promised the protection of the contractual guarantees that their policies would be credited with interest not less than four percent and that Genworth would not raise the Monthly

---

[1] The Bulletin states that "Genworth companies include:" "Genworth Life and Annuity Insurance Company," "Genworth Life Insurance Company," and "Genworth Life Insurance Company of New York." The Bulletin announces a COI Increase only for policies issued by the former two companies (but not Genworth Life Insurance Company of New York ("GLICNY")), and explains that "only Genworth Life Insurance Company of New York is admitted in and conducts business in New York." The Bulletin refers to "Genworth's change in monthly risk rate," and to "its expectations as to future investment earnings, mortality, persistency, expenses, and taxes," and treats those as the same for all Genworth entities.

Risk Rates to increase its own profits at their expense. The COI increase violates the policies in numerous respects.

8.  *First*, COI rates are designed to compensate the insurer for the mortality risk of the insureds, which is why Genworth calls them "monthly risk rates," and the main driver of COI rates are the insurer's mortality expectations. To justify such a massive rate hike, GLAIC must have experienced a recent, massive deterioration in its mortality expectations. But both industry experience and GLAIC's own statements belie any such claim: mortality experience has materially improved industry-wide since the Subject Policies were issued, and GLAIC itself has repeatedly acknowledged in recent years that its mortality expectations have continued to *improve*. Because GLAIC only pays death benefits on a UL policy at the time of death, and deducts COI (and other) charges from the policy account until that time, mortality improvements lead to *higher* profits for Genworth on UL policies, which should have led to a *decrease* in the Monthly Risk Rates, not an increase in those rates. There is no ground for the massive rate hikes imposed by Genworth in light of improving mortality.

9.  It is now well-documented that nationwide mortality expectations have *improved* significantly over the past several decades. The Society of Actuaries ("SOA") and the American Academy of Actuaries (the "Academy") periodically publish mortality tables based on information collected from America's largest insurers. Those tables show that mortality expectations have improved at a rate of roughly 1 percent per year over the past three decades.

10. And when answering an interrogatory last year by insurance state regulators in its annual filings with the National Association of Insurance Commissioners ("NAIC") if there are "anticipated experience factors underlying any non-guaranteed elements different from current experience," GLAIC stated that the difference between anticipated experience in 2018 from

current experience that same year "is the expectation of the **continuation of recent trends such as mortality improvement** . . ."  This opinion was signed on February 5, 2019 by GLAIC's Vice President, Lance Berthiaume, FSA, MAAAA.

11.     GLAIC made similar representations in its regulatory filings for every year between 2009 and 2017, in each case referencing a continuation of "recent trends" of "mortality improvement," which it anticipated would continue.  This means that for at least the past ten years GLAIC expected—and continues to expect—mortality rates to improve and insureds to live longer than GLAIC previously anticipated. For a universal life policy, where GLAIC collects premiums as long as the policyholder is alive and pays death benefits only when the policyholder dies, GLAIC's cost of providing insurance has continued to decrease as mortality expectations continue to improve.

12.     Indeed, Genworth Financial, Inc. ("Genworth Financial"), and its subsidiaries, have repeatedly relied on its improved mortality expectations in the last seven years to justify premium increases valued at **$11.5 billion** for a different type of Genworth insurance product, called long term care insurance ("LTC"). In an October 2019 earnings call, Genworth touted its success in achieving an astounding "$11.5 billion of approved LTC premium rate increases" since 2012, measured on a net present value basis. Contrary to universal life policies where improved mortality expectations lead to greater profits for Genworth, Genworth *loses* money on its LTC policies when its mortality expectations improve because the longer people live, the more long-term care costs Genworth must pay to policyholders. Genworth Financial—which reports in consolidated filings on behalf of itself and its subsidiaries, including GLAIC and GLIC—has explained in its Annual Reports that improved mortality expectations hurt its LTC business but help its life insurance business, saying: if "mortality rates are lower[] than our pricing assumptions, we could be required

to make greater payments under long-term care insurance policies and annuity contracts than we had projected. Conversely, if mortality rates are higher than our pricing assumptions, we could be required to make greater payments under our life … insurance policies." From 2012 through 2019, GLIC repeatedly cited this mortality improvement as a "main driver" of the LTC premiums increases:

**Key Information Used to Develop the Rates Including the Main Drivers**

"Our rates are based on assumptions regarding persistency (how long the policy stays in force), mortality (at what rate deaths occur), and voluntary lapses (when an insured voluntarily terminates his policy). Actual results are much higher than anticipated when the policy was originally priced which means that individuals are living longer and keeping their policies in force longer which results in more claims incurred. As a result, premiums must be adjusted to ensure current and future claims are adequately funded."

13.     Genworth cannot have it both ways: claiming that its mortality expectations have improved to justify LTC premium increases but ignoring that same fact in imposing increasing COI charges. Genworth's massive COI rate hike cannot be warranted due to its changed mortality expectations in light of this mortality improvement.

14.     *Second*, none of the other factors that Genworth claims to have based the increase on—investment earnings, persistency, expenses and taxes—have changed materially for the worse, or could justify such a massive COI rate hike, especially in light of the improved mortality. For example, Genworth recently touted that the 2017 tax cuts led to "$154 million of tax benefits associated with revaluing our deferred tax assets and liabilities to the new rate on the date of enactment." But Genworth ignored these tax benefits when it increased COI rates. Similarly, Genworth has not had any change in investment earnings, expenses or persistency that could lead to this massive increase—nor has it identified any in its statements to policyholders or elsewhere.

15.     Moreover, GLAIC regularly sends policyholders a report on the "illustrative future death benefits and policy values," and the policies hit by the COI increase promise that

policyholders will receive "a new projection of values" if they "ask" for it. Up until March 31, 2018, GLAIC continued to send illustrations to policyholders in which GLAIC "projected" that the *old, cheaper* COI rates would continue for the life of the policy. And then, Genworth suddenly raised rates in 2019. But nothing has changed in that short period of time since March 31, 2018 to justify this massive COI increase. As discussed, mortality expectations—by far the biggest driver of COI rates—have been improving industry-wide at a rate of approximately 1 percent per year. And lapse rates are relatively stable industry-wide, especially for policies, like all Subject Policies, that (on information and belief) have been in force for at least six years.

16.      ***Third***, Genworth's massive COI increase recoups past losses, in breach of the contractual provision stating that GLAIC "will not make any change" in Monthly Risk Rates "in order to recoup past losses." The purpose of this provision is two-fold.  First, insurance is intended to cover policyholders for unforeseen future events, with the insurance company taking the risk of the unknown (whereas events in the past are known), and second—like the regulatory statement and the illustration provision discussed above—is to prevent the insurer from engaging in a bait-and-switch tactic, where it projects cheaper COI rates in the future, collects premiums, and then, with customers locked in, turns around many years later and reveals more expensive COI rates due to changes in expectations that happened long ago or for mortality expectations that were known at the time of the sale. But Genworth's mortality expectations (including GLAIC's) have continued to improve, and any mismatch between its pricing assumptions and its current assumptions would have been known and recognized by Genworth many years ago. Similarly, the other actuarial factors upon which Genworth claims to have based the increase have either improved or remained stagnant in recent years. As a result, to the extent the COI increase offsets alleged losses, those losses were recognized many years ago, and the COI increase was designed to recoup losses.

Further, the rate increase was designed to boost profits and to shore up Genworth's failing LTC care business, which has sustained severe losses in the past decade. Shortly after the COI increase was announced, Genworth Financial's CFO stated on an earnings call that the "rate actions" and "prudent management of in-force blocks" were needed to allow Genworth to satisfy policyholder obligations, in light of the past financial troubles of the LTC business.

17.     __*Fourth*__, Genworth has not applied the change in Monthly Risk Rates to "all insureds with the same combination of the following: attained age; number of years of insurance in force; net amount of risk; and premium class," in breach of the contract. For example, on information and belief, the Genworth entities have not imposed any Monthly Risk Rate increase on any New York policies, but have imposed the rate hike on non-New York policies with the same attained age, number of years of insurance in force, net amount of risk, and premium class. The Bulletin announcing the COI increase, for example, says: "States – All except New York." That is a plain breach of the policies' terms.

18.     In addition, Genworth did not implement the COI increase on other universal life products that it issued during the same time period. This is because the true reason for the increase is not any recent change in mortality or lapse experience, as Genworth claims, but rather because Genworth now wants to increase its profits and to boost its LTC business, to induce lapses, and to recoup past losses.

19.     Making matters worse, in violation of the policy provision that promises illustrations if policyholders "ask" for them, GLAIC refused to provide illustrations for Subject Policies beginning in March 2018, and still refuses to do so. That hinders policyowners from making investment decisions or estate planning decisions at a time when that is needed most.

20.     The COI rate hike and Genworth's actions preceding it therefore breached the GLAIC policies in at least four respects:

> (a)  not determining COI rates based on the factors enumerated in the contract;
>
> (b)  imposing a massive increase in COI rates to recoup past losses;
>
> (c)  imposing non-uniform rate hikes on insureds; and
>
> (d)  refusing to provide an illustration upon request.

## THE PARTIES

21.     Plaintiff Brighton Trustees, LLC, which brings this action on behalf of and as trustee for Diamond LS Trust, is a Delaware limited liability company with its principal place of business in New York. The sole members of Brighton Trustees, LLC are individuals who are United States citizens domiciled in New York and Canada. Diamond LS Trust is a New York common law trust. Diamond LS Trust is the beneficial owner and entitlement holder of a universal life insurance policy subjected to Genworth's unlawful COI increase. That policy was issued by First Colony Life Insurance Company ("First Colony"), which merged into GLAIC in 2007. GLAIC assumed all First Colony's rights and responsibilities under the policy. The policy is a "First Choice Gold" policy; the policy number is 2957767; the policy date is October 22, 1999; the face amount is $2,000,000; the class is Preferred; the issue age is 59; the sex is Male; and the form is ULFCL99. Bank of Utah holds the policy as securities intermediary for Diamond LS Trust.

22.     Plaintiff Bank of Utah, solely as securities intermediary for Diamond LS Trust, is a Utah corporation with its principal place of business in Utah. Bank of Utah is securities intermediary to Diamond LS Trust. Bank of Utah maintains securities accounts for Diamond LS Trust as securities intermediary pursuant to written agreements—specifically, a September 30, 2016 Custodial and Trust Account Control Agreement between Bank of Utah and Brighton

Trustees, LLC, on behalf of and as trustee for Diamond LS Trust. Under the foregoing agreements, each policy constitutes a "Subject Life Contingent Asset" that Bank of Utah, as securities intermediary, has credited to the "Client Securities Account." Diamond LS Trust is the "beneficial owner" and "entitlement holder" under its respective agreements with Bank of Utah, and, accordingly, is entitled to exercise the rights that comprise each financial asset in the Client Securities Account. Bank of Utah, as securities intermediary for Diamond LS Trust, is identified as the owner and beneficiary of the policy on Genworth's records.

23.     Plaintiff Ronald L. Daubenmier is an individual who is domiciled and a citizen of the State of Iowa. Mr. Daubenmier owns a universal life insurance policy subjected to Genworth's unlawful COI increase. His policy was issued by First Colony. GLAIC assumed all First Colony's rights and responsibilities under the policy. Mr. Daubenmier's policy is a "First Choice Gold" policy; the policy number is 2962694; the policy date is June 22, 2002; the face amount is $100,000; the class is Select; the issue age is 60; the sex is Male; and the form is ULFCL99.

24.     Brighton Trustees, LLC, as trustee for Diamond LS Trust; Bank of Utah, as securities intermediary for Diamond LS Trust; and Ronald L. Daubenmier, are together referred to herein as "Plaintiffs."

25.     Defendant Genworth Life and Annuity Insurance Company ('GLAIC") is a corporation organized and existing under the laws of Virginia, having its principal place of business at 6620 West Broad Street, Richmond, Virginia. Among other products, GLAIC issues universal life insurance policies in all states but New York. Genworth Life Insurance Company ("GLIC") is the corporate parent of GLAIC, owning 100 percent of its stock. GLIC and GLAIC together own Genworth Life Insurance Company of New York ("GLICNY"), owning 65 percent

and 34.5 percent of its stock, respectively. The ultimate corporate parent of GLAIC, GLIC and GLICNY, is Genworth Financial, Inc.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(d) because this is a class action with diversity between at least one class member (including Plaintiffs) and one defendant and the aggregate amount of damages exceeds $5,000,000, and unnamed class members are citizens of states across the United States. This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d).

27.     This Court has personal jurisdiction over GLAIC, which has its principal place of business in Virginia.

28.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)–(c) because Defendant resides here and the events giving rise to Plaintiffs' causes of action occurred in this District, including GLAIC's COI rate overcharge.

## FACTUAL BACKGROUND

### A.     Cost of Insurance and Monthly Risk Rates

29.     The policies at issue are flexible-premium, universal life policies issued by GLAIC (including its predecessors).  They were all issued on standardized policy forms and insureds are not permitted to negotiate different terms.  The class on whose behalf this action is being brought consists of all owners of GE Gold, First Choice Gold, GE Gold II, First Choice Gold II, and all other universal life insurance policies issued, insured or assumed by GLAIC that have been, or will be, subjected to the COI rate increase that Genworth began announcing in or about September 2019.

30.     The Subject Policies are all flexible-premium, universal life policies, and there are no fixed or minimum premium payments required by the policies. The principal benefit of UL policies is that they permit policyholders to pay the minimum amount of premiums necessary to keep the policies in force. Unlike other kinds of whole life insurance that require fixed monthly premium payments, the premiums required for UL policies need only be sufficient to cover the COI charges and certain other specified expenses. The COI charge is typically the highest expense that a policyholder pays. The COI charge is deducted from the policy account (i.e., the savings component) of the policy on a monthly basis, so the policyholder pays the COI charge entirely to Genworth. Any premiums paid in excess of COI charges and expense components are applied to the policy account, sometimes known as "account value" or "cash value." These excess premiums earn interest at a declared interest rate not less than the guaranteed minimum interest specified in the policy. For the Subject Policies, Genworth agreed that it would credit interest on the account value at a guaranteed minimum rate of 4 percent.

31.     The structure of UL policies is beneficial because it allows policyholders to minimize their capital investment and generate greater rates of return through other investments. Depending on the interest rate environment and the credited rate, other policyholders may choose to heavily fund their policies and use the interest to pay COI charges and grow the account value.

32.     The size of the COI charge is highly significant to Plaintiffs and all UL policyholders for at least two important reasons. First, it dictates the minimum amount of money they must pay to keep a policy in force. Second, high COI rates can quickly diminish a policy's account value and reduce the amount of money on which the policyholder can earn interest. Absent a secondary guarantee, if a policy account value diminishes such that COI charges can no longer

be deducted, and the appropriate time expires after Genworth provides an accurate and adequate grace notice, then a policy will lapse unless additional premiums are paid in.

33.     Each of the Subject Policies has similar language regarding how adjustments to Monthly Risk Rates will be determined. Plaintiffs' policies state as follows:[2]

**CHANGES IN RATES, CHARGES AND FEES**
At its sole discretion, the Company may change the monthly risk rates and the credited interest rates. The monthly risk rates will not exceed the Guaranteed Maximum Monthly Risk rates and the credited interest rates will not be less than the Guaranteed Credited Interest Rate. The Guaranteed Maximum Monthly Risk rates and the Guaranteed Credited Interest Rate are shown in the Schedule.

The Company will base any change on its expectations as to future investment earnings, mortality, persistency, expenses and taxes. The Company will not make any change in order to recoup prior losses. Any change in the monthly risk rates will apply to all insureds with the same combination of the following: attained age; number of years of insurance in force; net amount of risk; and premium class.

34.     On information and belief, all polices hit by the COI increase contain materially the same terms as above. The policies at issue are all form policies, and insureds are not permitted to negotiate different terms. They are all contracts of adhesion.

35.     Universal life policies are designed to be permanent policies, which are held until the death of the insured. As Genworth's Annual Reports explain: "Our universal life insurance products are designed to provide permanent protection for the life of the insured."

36.     The main driver of COI rates is the insurer's cost of providing mortality coverage. Genworth's own SEC filings expressly refer to COI charges as "mortality charges" and state that they are intended to compensate for mortality risk:

> We also collect cost of insurance charges on our variable life insurance products to compensate us for the mortality risk of the guaranteed death benefit, particularly in the early years of the policy when the death benefit is significantly higher than the value of the policyholder's account.

Genworth 2007 10-K Annual Report at 11.

---

[2] Some Subject Policies have slightly different language, stating: "The rates for this plan are determined by the Company based on its expectation of future: mortality; interest; expenses; and persistency. A change in rate will be due to a change in the Company's expectation in one or more of these factors. The Company's past experience will not be a factor in such change. Any change in rate will apply to all insureds with the same issue age; sex; number of years of insurance in force; net amount at risk; and/or premium class."

**B.**     **Genworth's Announcement of Unlawful COI Rate Hike**

37.     In September 2019, Genworth sent a bulletin to its agents announcing the massive increase in cost of insurance charges for "GE Gold and First Choice Gold (Gold) as well as GE Gold II and First Choice Gold II (Gold II) Universal Life Insurance policies issued by Genworth Life Insurance Company (GLIC) and Genworth Life and Annuity Insurance Company (GLAIC)." The amount of the new COI charges and the actuarial justifications for it were not disclosed. Genworth disclosed only that "almost all policyholders will experience an increase in cost of insurance charges," and that the increase is "based on" Genworth's "expectations as to future investment earnings, mortality, persistency, expenses, and taxes, as set forth in the policy." The bulletin explains that Genworth will not send notification of the increase until 90 days before it goes into effect—which is on the first policy anniversary for each policy after December 1, 2019— and that Genworth will not provide an illustration to policyholders depicting future policy values using the new COI rates, despite the fact that the contracts require that.

38.     The letters that Genworth sent to policyholders are even more cryptic. They say:

> **Q1.**   **Why is Genworth adjusting the monthly deductions from the Policy Value?**
>
> **A.**    Your policy provides that the issuing insurance company (the Company) may change the Monthly Risk Rates used to calculate monthly cost of insurance charges based on its expectations as to future investment earnings, mortality, persistency, expenses, and taxes. That is the basis for these adjustments. The health of any insured person is not considered in making this kind of adjustment. Additionally, the Company cannot increase the rate higher than the Maximum Monthly Risk Rates stated in the policy.

39.     The letters further explain that this "adjustment to Monthly Risk Rates may negatively impact the Policy Value because, in general, it effectively increases the Monthly Deductions" that are taken out of the policy each month. The letters also warn that the rate hike "may increase the risk of policy lapse," and that a "failure to adjust premium payments to account for reduced policy values resulting from the change to the Monthly Risk Rates may increase the risk of policy lapse." On information and belief, all policyholders subjected to the increase have

received or will receive the forgoing communications. The letters include a table reflecting "the change in the Monthly Risk Rate" for the policy as a result of the increase, showing increases between 40 percent and 140 percent depending on the year.

40.    Like the bulletin, the letters also say that Genworth refuses to provide new illustrations using the new Monthly Risk Rates, even though the Subject Policies require it to do so upon request.

Q9.    Can I get an illustration based on the new rates?

A.     No. Illustration regulations require that a product meet certain testing conditions before an insurance company can provide policyholders with an illustration of that product based on current rates. Presently, the product you purchased does not meet those requirements.  Therefore, we can only provide a projection based on the policy guarantees -- the lowest interest rate and highest Monthly Risk Rates allowed by your policy. This "worst case" projection will differ from the actual values based on the new Monthly Risk Rates and currently credited interest rates.

We can provide you with information based on current rates and charges for one year into the future.  We recommend that you contact us before the end of each policy year to obtain up-to-date premium information for the following year.

41.    Genworth also warned that it may raise rates yet again if its expectations "change":

Q8.    Will you change Monthly Risk Rates again?

A.     The Monthly Risk Rate adjustments are based upon our expectations as to future investment earnings, mortality, persistency, expenses, and taxes.  It is possible that our expectations will change, and we may adjust the rates in the future.

42.    Genworth did not explain why the increases vary so much from year to year—some years 40 percent and others 140 percent—nor did it explain the rationale for the massive increase. The limited disclosures that Genworth did make were false: as discussed below, the COI increase was not "based upon" Genworth's "expectations as to future investment earnings, mortality, persistency, expenses, and taxes," but rather Genworth recouped past losses and increased its profits.

C.    **Genworth's Unlawful Hike in Cost of Insurance Charges**

i.    **The COI Increase Was Not Based on Contractually Permissible Factors**

43.     Plaintiffs' policies state that Genworth "will base any change" in its Monthly Risk Rates "on its expectations as to future investment earnings, mortality, persistency, expenses and taxes." Genworth does not contend that the increase is based on any other factors, telling policyholders that the "Monthly Risk Rate adjustments are based upon our expectations as to future investment earnings, mortality, persistency, expenses, and taxes." But no change to any of these enumerated factors independently, nor when considering all of the enumerated factors together, could warrant the massive COI increase. Not only did GLAIC ignore positive changes in enumerated factors (like the $154 million in tax benefits from the corporate tax reform), but recent changes in mortality, persistency, investment earnings, and expenses could not possibly warrant an increase, much less one of this massive size.

### 1. GLAIC's Expectations of Future Mortality Experience Have Improved

44.     GLAIC's expectations as to "mortality" could not have changed materially for the worse in recent years to warrant an increase in COI rates, much less a massive one—to the contrary, its mortality expectations have improved since the Subject Policies issued. Insurers like GLAIC systematically quantify their "expectations of future mortality" on an annual or biennial basis. They perform experience studies which examine their historical mortality experience and, from that mortality experience, develop predictions of mortality they expect to see in the future. These expectations are explicitly quantified in the form of mortality tables, which are charts showing the expected rate of death at a certain age. Rate of death can be measured as a percentage or in terms of the number of deaths per thousand.  Separate tables are produced to reflect groups with different mortality. Mortality tables will usually have separate tables for gender. Mortality tables for use with individual life insurance policies additionally distinguish mortality rates for

tobacco-use status, underwriting status and duration since underwriting.  Mortality tables are used by actuaries to calculate insurance rates, and, if developed properly, are designed to reflect the carrier's expectations of future mortality.  Genworth Financial's Annual Reports confirm that Genworth follows this practice, and that its mortality and other actuarial assumptions do not vary between GLIC and GLAIC. Those reports discuss Genworth's "annual review of assumptions," typically done in the fourth quarter, which includes a review of Genworth's "persistency, long-term interest rates, mortality" and other factors underlying its universal life policies. As described in more detail below, the fact that Genworth conducts annual assumption reviews makes it impossible that any recent changes purportedly necessitated a 140 percent increase.

45.    Beginning at least as early as 1941, the National Association of Insurance Commissioners ("NAIC") has issued a series of Commissioners Standard Ordinary ("CSO") mortality tables. The Society of Actuaries ("SOA") has established a committee to develop an update of the Commissioners Standard Ordinary ("CSO") tables, which are industry standard mortality tables that are commonly used by insurers to calculate reserves and to set maximum permitted cost of insurance rates in universal life policies.  A report on the updated CSO tables by the SOA was published in October 2015 and showed significant reductions in insurance company reserves due to recent mortality improvements.

46.    The 1980 table issued by the NAIC was called the 1980 Commissioners Standard Ordinary Smoker or Nonsmoker Mortality Table ("1980 CSO Mortality Table").  That table was the industry-standard table until 2001.  In 2001, at the request of the NAIC, SOA and the American Academy of Actuaries ("Academy") produced a proposal for a new CSO Mortality Table.  The accompanying report from June 2001 explained that (a) the 1980 CSO Mortality Table was still

the industry-standard table and (b) expected mortality rates had improved significantly each year since the 1980 table issued.  The report stated:

> The current valuation standard, the 1980 CSO Table, is almost 20 years old and mortality improvements have been evident each year since it was adopted. . . . [C]urrent mortality levels . . . are considerably lower than the mortality levels underlying the 1980 CSO Table.

47.     The report further explained that "[f]or most of the commonly insured ages (from about age 25 to age 75), the proposed 2001 CSO Table mortality rates are in the range of 50% to 80% of the 1980 CSO Table."  This means the tables are showing a substantial improvement in mortality in a 20-year time period.  These mortality improvements represent a substantial benefit that Genworth should have passed on to policyholders.  The final proposed tables were adopted as the 2001 Commissioners Standard Ordinary Mortality Table ("2001 CSO Mortality Table").  The 2001 CSO Mortality Table reflected vastly improved mortality experience as compared to the 1980 CSO Mortality Table.

48.     The SOA established a committee to develop an update of the CSO tables.  A report on the updated CSO tables by the SOA was published in October 2015 and showed further significant reductions in insurance company reserves compared to CSO 2001 due to mortality improvements since 2001.

49.     The 2001 CSO Mortality Table was generated from the 1990–1995 Basic Mortality Tables published by the SOA. The SOA performs surveys of large life insurance companies for the death rates actually observed in their policies and compares these to published mortality tables. Periodically the SOA will publish an updated table to reflect the evolving industry experience. Major mortality tables they have published over the last few decades include:

- 1975–1980 Basic Select and Ultimate Mortality Table
- 1985–1990 Basic Select and Ultimate Mortality Tables
- 1990–1995 Basic Select and Ultimate Mortality Tables
- 2001 Valuation Basic Mortality Table

- 2008 Valuation Basic Table
- 2015 Valuation Basic Table

50.     The 1990–1995 Basic Table reflected the death rates observed by twenty-one large life insurance companies with policy anniversaries between 1990 and 1995.  The 2001, 2008 and 2015 Valuation Basic tables each show significant mortality improvements from the 1990–1995 Basic tables demonstrating that since the introduction of the 2001 CSO Mortality Table, mortality experience has continued to improve substantially and consistently.  The report accompanying the 2015 Valuation Basic Table states: "The current CSO table was created in 2001 based on experience from 1990–1995 and thus, is at least 20 years old. Since that time, industry experience studies performed by the Society of Actuaries Individual Life Experience Committee ("ILEC") have shown significant mortality improvement in the mortality rates experienced by the industry from that underlying the 2001 CSO table development." Other surveys have also noted mortality improvements. In May 2013, the reinsurance company RGA published a report sponsored by the SOA enumerating mortality rates and mortality improvements at older ages, which showed material rates of mortality improvements. The report was based on a survey of insurance companies—including Genworth. In March 2014 the actuarial firm Milliman published a report sponsored by the SOA called "Select Period Mortality" showing select rates of mortality that are strongly improved over 2001 VBT. Their report was based on a survey of insurance companies— including Genworth.

51.     This trend of improving mortality expectations has continued to the present day in the industry. In 2017, the SOA published a study with recommendations for mortality improvement assumptions for insurance reserving for AG-38 (Actuarial Guideline No. 38), which covers reserving for certain universal life insurance policies. The SOA updates this study annually and these studies show improving mortality across the board for the last five years, with no

negative figures in any published table from 2013 and 2017. And in 2019, the SOA issued a report finding that in 2018, the United States age-adjusted mortality rate realized its largest decrease since 2009, and the 2018 mortality rate is now the lowest mortality rate in U.S. history. These mortality improvements represent a substantial benefit that Genworth should have passed on to policyholders in the form of cheaper COI rates, but never did.

52. Industry insiders also report continuing and consistent mortality improvements. For example, statistics published by The Human Mortality Database (HMD, organized by the Department of Demography of the University of California, Berkeley), show increases in life expectancy and lowering of mortality rates between 2010 and 2015 for older-aged individuals in the United States. And a SOA report on historical population mortality rates shows continuing mortality improvements every five years between 2000 and 2014.

53. GLAIC has repeatedly acknowledged that, consistent with industry experience, its expectations of future mortality have improved. Each year, insurers are required to file annual interrogatory statements with the NAIC. These sworn statements are certified and signed by an actuary. The interrogatories include questions regarding COI rates and whether future expectations have changed. For example, Question 4 asks: "Are the anticipated experience factors underlying any nonguaranteed elements [e.g., COI rates] different from current experience?" In reporting for each of 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, and 2018, GLAIC stated that it expected a "continuation" of recent trends such as "mortality improvement." GLAIC has therefore acknowledged the trend of improved expectations of future mortality and admits that it expects this trend to continue. Further, GLAIC has repeatedly admitted in these responses that this "would affect the levels of premiums or cost of insurance rates changed."

## 2.   Other Factors Do Not Warrant An Increase

54.     Genworth also claims that the increase is based on changes in the other factors—its expectations as to future investment earnings, persistency, expenses and taxes—but it has not explained how. The massive increase could not be based on changes to any of these factors, especially in light of improving mortality expectations, which outweigh any of these factors.

55.     ***First***, GLAIC's expectations as to "future investment earnings" could not have changed materially for the worse in recent years to warrant an increase in COI rates, much less a massive one. In Genworth Financial's financial statements, Genworth indicated that its "net investment income" and "yield" on that income has ***grown*** in recent years, reporting: $3.138 billion with 4.5% yield (2015), $3.159 billion with 4.5% yield (2016), $3.200 billion with 4.6% yield (2017), $3.262 billion with 4.6% yield (2018). Similarly, Genworth Financial reports a "discount rate" that "represents our expected investment returns," and its discount rate assumption for its main long-term care block has generally increased in recent years: 5.24% (2015); 5.31% (2016); 5.3% (2017); 5.3% (2018). GLAIC's interrogatory statements have stated, since at least 2014, that "the interest rate environment has declined significantly since many of the in-force products were priced," but Monthly Risk Rates may only be changed to account for changes in *future* experience factors, not to compensate the company for any investment losses in the past. Further, the policies have a *separate* "credited interest rate," which is adjustable to account for any changes in the interest rate environment.

56.     ***Second***, GLAIC's expectations as to future "persistency" could not have changed for the worse in recent years to warrant an increase in COI rates, much less a massive one. Plaintiffs' policies issued in 1999 and 2002, and on information and belief, all Subject Policies have been in force for more than six years. A 2012 SOA industry study—reporting on a survey of

the industry—indicated that between 2001 and 2009, the industry lapse rates for universal life policies that have been in force more than six years are stable, varying less than approximately 2 percentage points over that span, and that the lapse rates become more stable the longer the policy has been in force. This indicates that any volatility that Genworth may have seen in these policies would have occurred in the early years, not now. And to the extent Genworth priced the policies using unreasonable lapse-supported assumptions, it may not now pass the projected late duration losses on to persisting policyowners through the COI Increase. Further, Genworth has stated in its Annual Reports since at least 2009 that for its "universal life insurance policies, increased persistency that is the result of the sale of policies by the insured to third parties that continue to make premium payments on policies that would otherwise have lapsed, also known as life settlements, could have an adverse impact on profitability because of the higher claims rate associated with settled policies." But Genworth is not permitted to raise rates because of persistency it has experienced and known about since at least 2009, which would amount to recouping past losses, but rather may only consider "future" persistency.

57.     ***Third***, GLAIC's expectations as to future "expenses" could not have changed materially for the worse in recent years to warrant an increase in COI rates, much less a massive one. For example, Genworth Financial's financial statements report on its "acquisition and operating expenses, net of deferrals," which it describes as the "costs and expenses related to the acquisition and ongoing maintenance of insurance and investment contracts." These too have **decreased** in recent years: $1.273 billion (2016); $1.022 billion (2017); $.997 billion (2018). Furthermore the large majority of expenses incurred by an insurance company for universal life insurance policies occur at the time of sale the policy, with the commitment to pay origination commissions to sales teams. Genworth cannot base its change on events that happened in the past

(i.e., the sale of the policy) without violating the contract's bar on recouping prior losses. Additionally, the allocated expense of maintaining insurance contracts is nominal—typically $50 to $100 per policy per year—and does not materially change from year to year, let alone in a way that could justify a 140 percent increase in COI rates. In fact, the Subject Policies already charge a separate "monthly administrative fee" and "premium expense charge" designed to cover these expenses.

58.     ***Fourth***, GLAIC's expectations as to future "taxes" could not have changed materially for the worse in recent years to warrant an increase in COI rates, much less a massive one. To the contrary, Genworth's expectations as to future taxes are now materially better, as a result of the corporate tax reform, which should have resulted in lower COI rates, not an increase in rates. After the Tax Cuts and Jobs Act ("TCJA") corporate tax reform was announced, Genworth Financial stated in public filings that this benefited Genworth Financial's tax outlook going forward, including a $154 million benefit in 2017:

> Prior to the recent TCJA, the top U.S. corporate federal income tax rate was 35% for corporations with taxable income greater than $10 million. The TCJA reduced the U.S. corporate federal income tax rate to 21% effective for taxable years beginning after December 31, 2017. Included in our 2017 benefit for income taxes is $154 million of tax benefits associated with revaluing our deferred tax assets and liabilities to the new rate on the date of enactment.[3]

Genworth's COI increase makes no mention of the favorable corporate tax rate, which should have lowered COI rates, not raised them.

### ii.     The COI Increase Recouped Past Losses

59.     The policies prevent GLAIC from making "any change" in Monthly Risk Rates "in order to recoup past losses." This provision forbids COI increases to make up for past losses, or

---

[3] In its Annual Statement for 2018, GLAIC states that it is "an affiliated member of a consolidated Life/Non-Life U.S. Federal income tax return with its ultimate parent company, Genworth Financial, Inc. ("Genworth"), and will be included" in the consolidated Federal income tax return for 2018 with, among other entities, GLIC and GLICNY.

from implementing a COI increase that would result in the carrier making more profit on the policies than it previously expected using its prior expectations. One purpose of this provision— like the interrogatories to regulators discussed above—is to prevent the insurer from engaging in a bait-and-switch tactic, where it projects cheaper COI rates in the future, collects premiums, and then turns around years later and reveals more expensive COI rates due to changes in expectations that happened long ago or were present at the time of the sale.

60.     The provision against recoupment of past losses is particularly important for universal life insurance policies issued in the 1990s and early 2000s, when the market was extremely competitive and abuses were rampant. At that time, insurance companies principally relied upon sales illustrations to sell universal life insurance policies to consumers. In their quest to illustrate the most competitive products (i.e., providing higher death benefits and policy values for a lower cost), GLAIC and other insurance companies adopted overly aggressive and unreasonable pricing assumptions.

61.     If GLAIC's story is to be believed, GLAIC designed its policies to generate high profits in early policy durations, followed by losses in later generations. GLAIC achieved these early profits, in part, by using "reverse select ultimate" mortality assumptions that allowed it to reap high mortality profits in early durations, thereby front-loading those profits, followed by mortality losses in later durations that were insufficient to cover the cost of anticipated death claims. If GLAIC's story is to be believed, GLAIC thus delayed its long-term obligations and projected late-duration losses to far distant reporting periods and discounted those liabilities and future losses using unrealistic assumptions.

62.     GLAIC also avoided the impact of late-duration mortality losses through lapse-supported pricing in the design of the policies. Rather than traditional conservatively priced

policies, where profitability improves if lapses are less than assumed, lapse-supported policies become less profitable when fewer policies lapse (due to projected duration mortality losses). If GLAIC's story is to be believed, GLAIC knew when it designed the policies that the block of business would be unprofitable if all or a substantial percentage of purchasers persisted until death benefits were paid on their contracts. Thus, if GLAIC's story is to be believed, for the cohort of policies owned by Plaintiffs and putative class members, which have persisted for the last two decades, the current in-force policies were priced to have losses in the late durations, with such losses having minimal impact on the illustrated performance at the time of sale since the losses were far in the future and substantially discounted to the time of pricing.

63.     Furthermore, for competitive reasons, GLAIC priced the policies using very low projected interest rate spreads. The interest rate spread is the difference between the rate earned by GLAIC on the assets (primarily bonds) purchased with policy premiums and the non-guaranteed interest rate credited to the policies, net of certain charges. The interest spread thus represents GLAIC's projected interest earnings on the policies. GLAIC's decision to assume high initial accumulation values and modest interest spreads contributed to the priced-for pattern of front-loaded profits followed by late duration losses.

64.     The Subject Policies thus were designed to allow GLAIC to realize high mortality profits in the early years, immediately after the policies were priced and issued. But as the policies progressed to the later durations, GLAIC faced constrained future profits and looming future losses resulting from its policy design choices, if its story is to be believed. When the date arrived to confront its pricing decisions, GLAIC reacted by saddling policyholders with the massive COI increase at issue in this litigation.

65.     States developed regulations designed to curtail this type of life insurance industry

practice, and Genworth's letter to policyholders even references these "illustration regulations."

It states, "illustration regulations require that a product meet certain testing conditions before an

insurance company can provide policyholders with an illustration of that product based on current

rates." More specifically, insurance regulations require that universal life illustrations be based on

reasonable and current assumptions underlying the current COI rates. At least as late as March

2018, GLAIC was certifying that its illustrations were supported by its then-current mortality,

persistency, expense, and investment earnings expectations.

66.     For the reasons stated above, it is simply impossible that GLAIC's cost expectations

suddenly deteriorated by 140 percent between March 2018 to September 2019.  For such an

increase to be justified, GLAIC's projected mortality rates would have had to double.  In its

financial statements, Genworth claims to do an "annual review" of its actuarial assumptions,

including its mortality assumptions.  A doubling of mortality rates could not have happened in one

year.

67.     So, to the extent GLAIC's mortality and other assumptions have not been as good

as it originally expected for these policies, those losses were recognized and accepted by GLAIC

long ago, thereby establishing a new baseline for any future increase. GLAIC cannot use a COI

increase now to make up for losses that it knew about, and accepted, long ago, which it certified

as being the "anticipated experience factors underlying [its] nonguaranteed elements," and which

it continued to use in illustrations through at least March 2018. To do so would be to recoup past

losses, in violation of the express terms of the Subject Policies.

68.     Projected losses in Genworth's LTC business only compounded the need to impose

the COI rate hike. Genworth's "U.S. Life Insurance division" houses both its LTC and universal

life business, which is held by GLIC, GLICNY and GLAIC. GLAIC focuses on universal life and other non-LTC business. GLAIC is wholly owned by GLIC, and GLIC houses a large portion of Genworth's LTC business. Genworth recently tried to separate the LTC and universal life businesses in a planned sale to a Chinese company, called Oceanwide, but insurance regulators rejected the plan to decouple the LTC and universal life business. As a result, Genworth still uses profits from GLAIC's universal life business to shore up its failing LTC unit, and this COI increase is part of that effort.

69.     In August 2013, Genworth Financial's President announced that Genworth was "conducting an intense, very broad and deep review of all aspects of our long-term care insurance business." On an October 30, 2013 conference call, Genworth Holding, Inc.'s CEO, Thomas McInerney, confirmed that the review was complete and the reserves were adequate: "And while we have been saying for some time that we believe the reserves were adequate within margin. We're now saying, or I said today, that after this four-month extensive review, we're more confident than we've ever been that the reserves are adequate, within a comfortable margin."  He explained, "we have been assessing our long-term care reserves under both GAAP and statutory reporting, and determining whether to make any changes" and that review "consider[ed] all important aspects" including "[t]he assumptions, best estimates and also a detailed review of our statutory reserves." On a December 2013 presentation after completing Genworth's "very broad and deep review" into all aspects of its LTC business, with an emphasis on reserves, Mr. McInerney stated "we have adequate long-term care reserves, with a margin for future deterioration, and our presentation today provides support for these conclusions." This conclusion, Genworth said, was derived from "very credible experience on 190,000 claims that we look at."

70.     In November 2014, Genworth announced that its reserves were woefully inadequate, and that it needed to increase reserves by $531 million and take an after-tax charge of $345 million in the third quarter. That charge was tied to updated assumptions, including mortality assumptions, for its LTC insurance division, which led to a $844 million loss in that quarter alone. These mortality assumptions were improved from when Genworth last did a deep review in 2013. Genworth's shares plunged 38 percent, wiping more than $2.69 billion in the company's market capitalization.   Genworth Financial announced that as a result of this restatement, Genworth Financial would "forego dividend payments from the life division for the remainder of 2014 and 2015." Prior to this, Genworth Financial's insurance subsidiaries—principally GLIC and GLAIC—had paid unearned dividends to the Genworth Financial holding company of at least $545 million from 2010 through 2014. After the November 2014 announcement, the ratings agencies significantly downgraded Genworth Financial's ratings, with S&P announcing that it had "lowered its long-term counterparty credit and senior unsecured debt ratings on Genworth" to junk status. S&P also assigned Genworth Financial a "negative outlook," which reflected "execution risk in the turnaround of the U.S. life insurance division."  Genworth Financial then admitted that that the rating changes "are expected to reduce sales in some of [Genworth's] products," and "future borrowing costs are likely to increase."

71.     To combat these losses due to improved mortality among other factors, Genworth launched a plan to dramatically increase LTC premiums. In its 2018 Annual Report, Genworth went so far as to recognize that "the continued viability" of "GLIC" depends on "on our ability to obtain significant price increases" through "increased premiums" or benefit reductions.  As part of this strategic plan to increase premiums, Genworth Financial reported in October 2019 that it "has achieved approximately $11.5 billion of approved LTC premium rate increases" since 2012. In

2014, Genworth Financial's CEO told investors that Genworth is "leading the charge on reshaping this industry" as it pursues rate increases. Amid this turmoil, on March 7, 2016, Genworth suspended sales of traditional life insurance and fixed annuity products—including all universal life insurance.

72.     Because of these losses and poor financial ratings, Genworth is also trying to sell itself. On October 21, 2016, Genworth Financial, Inc. entered into an agreement and plan of merger with various subsidiaries of China Oceanwide Holdings Group Co., Ltd., a limited liability company incorporated in the People's Republic of China. Pursuant to that agreement, China Oceanwide agreed to acquire all the outstanding stock of Genworth Financial, Inc. for $2.7 billion.

73.     As part of the transaction, China Oceanwide originally committed to contribute $525 million to enable the purchase of GLAIC from GLIC for $700 million, which Genworth refers to as "GLAIC unstacking."  GLIC has a large LTC unit as well as universal life unit, but GLAIC does not have a large LTC unit. Genworth reported in its Annual Report that "separating and isolating our long-term care insurance business" through the GLAIC unstacking "has been an important strategic objective," because Genworth Financial believed it would: "help to isolate the downside risk from our long-term care insurance business that is putting downward pressure on the ratings of Genworth Holdings and our other subsidiaries"; "allow any future dividends from GLAIC to be paid directly to the holding company"; and "provide a clearer picture of the necessity for the long-term care insurance rate actions that we are working towards today."

74.     But the Delaware regulator in 2018 approved the Oceanwide Transaction only on condition that Genworth Financial *not* proceed with the planned GLAIC unstacking. Genworth Financial previously reported that the Delaware regulator had hired an independent third-party valuation specialist, which Genworth Financial believed placed a value higher than $700 million

on GLAIC. On information and belief, this higher valuation is partly due to GLAIC understating its future income because of actuarial assumptions that understate GLAIC's future profits—the same improper assumptions that Genworth is using to increase COI rates. As a result of this regulatory condition that prevents the GLAIC unstacking, Genworth's LTC insurance business continues to create "downside risk" on GLAIC and to put "downside pressure" on their ratings. It also means that GLAIC's dividends continue to be paid to GLIC, which needs to use them to shore up its LTC insurance business. As a result, GLAIC's and GLIC's businesses continue to have to support the failing LTC business, and this COI increase is part of that effort.

75.     Making matters worse, in August 2019, Oceanwide refused to put any more capital into GLAIC or GLIC to help sustain the U.S. Life entities.  In a press release, after the GLAIC unstacking was disapproved, Genworth announced that it "intends to manage the U.S. life entities on a standalone basis, with no plans to infuse capital in the future beyond the $175 million pledged to Genworth Life Insurance Company (GLIC) in connection with the completion of the Oceanwide transaction." As a result, GLIC and GLAIC will continue to have to support the failing LTC business.[4]

76.     The situation with Genworth's LTC business is still dire. In August 2019, ratings agency Fitch Group issued a report again questioning the health of Genworth Financial, and its LTC business, suggesting it has an inadequate amount of cash on hand to pay future insurance claims associated with old age. Fitch made its assessment based largely on what it called "aggressive" assumptions about the reserves needed to pay future benefits to LTC policyholders,

---

[4] GLICNY appears to be an exception to this rule. Ultimately, as a condition of approval of Genworth Financial's merger with Oceanwide, New York regulators required Genworth Financial to contribute $100 million in capital to GLICNY, and on information and belief, Genworth Financial did, in fact, contribute this capital to GLICNY. Press Release, Genworth Financial, Inc., Agreement in Principle Reached with New York Regulator Regarding Proposed Oceanwide Acquisition of Genworth's New York-Domiciled Insurance Company, *available at* https://newsroom.genworth.com/2020-03-02-Agreement-in-Principle-Reached-with-New-York-Regulator-Regarding-Proposed-Oceanwide-Acquisition-of-Genworths-New-York-Domiciled-Insurance-Company.

including mortality assumptions.[5]  The mortality assumptions are aggressive in the sense that they **underestimate** how long people will live. In the context of LTC insurance, the fact that mortality rates are overstated would necessitate higher premiums. In the context of universal life insurance, by contrast, the fact that mortality assumptions are overstated means that cost of insurance rates should be reduced.  Yet Genworth now seeks to increase those COI rates by up to 140 percent in order to subsidize its LTC unit.

77.     Meanwhile, in an October 2019 investor call—around the same time the COI increase was implemented—Genworth's CFO, Kelly L. Groh, repeated that it is now Genworth Financial's intention to manage "all of our U.S. life entities on a stand-alone basis with no other future plans to infuse capital in these businesses."  To make up for the failing LTC business, he said that "the U.S. life businesses," including GLIC and GLAIC, will rely on "prudent management of in-force blocks and the actuarially justified rate actions to satisfy policyholder obligations."

78.     This COI increase is part of that plan (except it is not actuarially justified): a "rate action" and "management of in-force blocks" done in order to make up for past losses in an unrelated LTC business. That recoups past losses in breach of the terms of the Subject Policies and is an increase in rates for reasons that are not based on "its expectations as to future investment earnings, mortality, persistency, expenses and taxes."

---

[5] Gia Curci, Genworth, GE and Unum Need to Shore Up Long-Term Care Business: Report, Investment Report, Aug. 20, 2019, *available at*:
 investmentnews.com/article/20190820/FREE/190829991/genworth-ge-and-unum-need-to-shore-up-long-term-care-business-report.

### iii.   **The COI Increase Was Not Applied Uniformly**

79.     The policies require that any "change in the monthly risk rates will apply to all insureds with the same combination of the following: attained age; number of years of insurance in force; net amount of risk; and premium class." The Genworth entities breached this provision by, on information and belief, not imposing the COI increase on New York policyholders with the same combination of characteristics. Genworth issues New York policies out of Genworth Life Insurance Company of New York (GLICNY). On information and belief, GLICNY issued policies that are materially identical to the Subject Policies, and that were priced using the same assumptions; further, GLICNY's actuarial assumptions for universal life policies are the same as GLIC's and GLAIC's. But while the GLIC and GLAIC entities have announced COI increases; on information and belief, GLICNY has not.

80.     Further, Genworth's bulletin announcing the COI increase adds a limiting phrase that is not in the contract when describing how the increase was implemented, saying that "this adjustment is being made for all policies **on the same policy form** with the same combination of the following characteristics: Attained Age, sex, length of time insurance has been in force, net amount at risk; and premium class." But the uniformity provision in the Subject Policies does not contain a limitation only for policies issued "on the same policy form." On information and belief, that provision was breached because COI rates were not adjusted on policies issued on different policy forms, even though they had the same combination of "attained age; number of years of insurance in force; net amount of risk; and premium class."

## CLASS ACTION ALLEGATIONS

81.     This action is brought by Plaintiffs individually and on behalf of a class pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.  The class—referred to as the "COI Increase Class"—consists of:

> All owners of universal life insurance policies issued, insured or assumed by Genworth Life and Annuity Insurance Company, or its predecessors or successors, subjected to the cost of insurance rate increase announced effective December 1, 2019 (excluding defendant Genworth Life and Annuity Insurance Company, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing).

82.     This class consists of at least hundreds of consumers of life insurance and is thus so numerous that joinder of all members is impracticable. The identities and addresses of class members can be readily ascertained from business records maintained by GLAIC.

83.     Plaintiffs' claims are typical of the claims asserted by the COI Increase Class.

84.     Plaintiffs will fairly and adequately protect the interests of the COI Increase Class and do not have any interests antagonistic to those of the other members of this class.  Plaintiffs are willing and prepared to serve the Court in a representative capacity.

85.     Plaintiffs have retained attorneys who are knowledgeable and experienced in life insurance matters, COI increase matters, as well as class and complex litigation.

86.     Plaintiffs request that the Court afford class members with notice and the right to opt-out of any class certified in this action.  The names and addresses of all class members are in Genworth's business records, and class members are readily and objectively identifiable.

87.     This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the class predominate over those questions affecting only individual members. Those common questions include:

(a)      the construction and interpretation of the form insurance policies at issue in this litigation;

(b)      whether GLAIC's actions to increase the cost of insurance charges on certain UL policies violated the terms of those form policies;

(c)      whether Plaintiffs and class members are entitled to receive damages as a result of the unlawful conduct by defendant alleged herein and the methodology for calculating those damages.

88.      This action is also appropriate as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because Genworth has refused to provide illustrations upon request, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

89.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a)      because of the complexity of issues involved in this action and the expense of litigating the claims, few, if any, class members could afford to seek legal redress individually for the wrongs that defendant committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

(b)      when defendant's liability has been adjudicated, claims of all class members can be determined by the Court;

(c)      this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

(d)      without a class action, many class members would continue to suffer injury, and defendant's violations of law will continue without redress while defendant continues to reap and retain the substantial proceeds of its wrongful conduct; and

(e)      this action does not present any undue difficulties that would impede its management by the Court as a class action.

## FIRST CLAIM FOR RELIEF

### Breach of Contract
### (on behalf of Plaintiffs, and the COI Increase Class)

90.      Plaintiffs reallege and incorporate all allegations of this complaint as if fully set forth herein.

91.      The Subject Policies are binding and enforceable contracts.

92.      At all relevant times, Plaintiffs and other class members have paid monthly premiums to GLAIC and have otherwise performed all their obligations under the Policies.

93.      The 2019 COI rate increase and conduct by GLAIC that preceded it have materially breached the policies in several respects, including but not limited to:

(a)      not determining COI rates based on the factors enumerated in the contract that Genworth claimed the increase was based on;

(b)      imposing a massive increase in COI rates to recoup past losses;

(c)      imposing non-uniform rate hikes on insureds;

(d)      failing to provide an illustration upon request; and

(f)      improperly breaching the covenant of good faith and fair dealing.

94.      Plaintiffs have performed all obligations under the policies, except to the extent that their obligations have been excused by GLAIC's conduct as set forth herein.

95.     As a direct and proximate cause of GLAIC's material breaches of the policies, Plaintiffs and class members have been—and will continue to be—damaged as alleged herein in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

### Injunctive Relief as to Refusal to Provide Illustrations
### (on behalf of Plaintiffs and COI Increase Class)

96. Plaintiffs reallege and incorporate all allegations of this complaint as if fully set forth herein.

97. Plaintiffs' policy contracts state: "The Owner may ask for a projection of illustrative future death benefits and policy values" and "If asked, the Company will provide a new projection of values."

98. GLAIC has refused to provide illustrations for policies since March 2018, stating a company-wide policy that: "Unfortunately, we will not be able to provide an in-force illustration reflecting this adjustment."

99. GLAIC's refusal to provide illustrations reflecting the COI adjustment is a breach of the policy contract.

100.     Plaintiffs therefore seek, on behalf of themselves and the COI Increase Class, injunctive relief prohibiting GLAIC from denying illustrations to policyholders upon request.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the COI Increase Class pray for judgment as follows:

1.      Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2.      Awarding Plaintiffs and the damages class compensatory damages, restitution, disgorgement, reinstatement of lapsed and/or surrendered policies, and any other relief permitted by law or equity;

3.      Awarding Plaintiffs and the damages class pre-judgment and post-judgment as well as costs, and all other relief set forth above;

4.      Awarding Plaintiffs and the injunctive class injunctive or declaratory relief, as well as attorneys' fees and costs; and

5.      Awarding Plaintiffs and the classes such other relief as this Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs and the class hereby demand a trial by jury as to all issues so triable.


Dated:  July 17, 2020                          Respectfully submitted,


                                               /s/ Ellen D. Marcus
                                               Ellen D. Marcus (Virginia Bar No. 44314)
                                               Kathleen J.L. Holmes (Virginia Bar No. 35219)
                                               HOLMES COSTIN & MARCUS PLLC
                                               301 N. Fairfax Street, Suite 202
                                               Alexandria, VA 22314
                                               Tel:    703-260-6401
                                               Fax:    703-439-1873
                                               emarcus@hcmlawva.com
                                               kholmes@hcmlawva.com

Steven G. Sklaver (*pro hac vice*)
Lora J. Krsulich (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Tel:   310-789-3100
Fax:   310-789-3150
ssklaver@susmangodfrey.com
lkrsulich@susmangodfrey.com

Seth Ard (*pro hac vice*)
Ryan Kirkpatrick (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel.:   212-336-8330
Fax:   212-336-8340
sard@susmangodfrey.com
rkirkpatrick@susmangodfrey.com

Jonathan J. Ross (*pro hac vice*)
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Tel:   713-653-7813
Fax:   713-654-3399
jross@susmangodfrey.com

*Interim Lead Class Counsel*

Francis J. Balint, Jr. (Virginia Bar No. 21909)
Andrew S. Friedman (*pro hac vice*)
BONNETT, FAIRBOURN, FRIEDMAN &
BALINT, PC.
2325 East Camelback Road, Suite 300
Phoenix, Arizona 85016
Tel: 602- 274-110
Fax: 602-274-1199
afriedman@bffb.com
fbalint@bffb.com

*Attorneys for Plaintiff Daubenmier*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 17th day of July, 2020, I electronically filed a copy of the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.


/s/ Ellen D. Marcus
Ellen D. Marcus